RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION:  2000 FED App. 0263P (6th Cir.)
File Name:  00a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DAVID T. HUNTER (99-3620);
ROBERT ALLISON, et al.
(99-3623),
  *Plaintiffs-Appellants,*

   *v.*

CALIBER SYSTEM, INC., f/k/a
Roadway Services, Inc., et
al.,
  *Defendants-Appellees.*

Nos. 99-3620/3623

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
Nos. 96-01186; 97-00321—James L. Graham, District
Judge.

Argued:  May 2, 2000

Decided and Filed:  August 2, 2000

Before:  MERRITT and COLE, Circuit Judges; QUIST,
District Judge.[*]

_____

[*]The Honorable Gordon J. Quist, United States District Judge for the
Western District of Michigan, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:**    Tony C. Merry, McCARTHY PALMER VOLKEMA & THOMAS, Columbus, Ohio, for Appellants. Michael R. Reed, SQUIRE, SANDERS & DEMPSEY, Columbus, Ohio, Daniel W. Srsic, LITTLER MENDELSON, Columbus, Ohio, Albert J. Lucas, CALFEE, HALTER & GRISWOLD, Columbus, Ohio, for Appellees. **ON BRIEF:** Tony C. Merry, McCARTHY PALMER VOLKEMA & THOMAS, Columbus, Ohio, for Appellants. David J. Young, SQUIRE, SANDERS & DEMPSEY, Columbus, Ohio, Daniel W. Srsic, David A. Kadela, LITTLER MENDELSON, Columbus, Ohio, Albert J. Lucas, CALFEE, HALTER & GRISWOLD, Columbus, Ohio, for Appellees.

———————————

**OPINION**

———————————

GORDON J. QUIST, District Judge.  These consolidated cases arise out of the January 1, 1996, spin-off of Defendant Roadway Express, Inc. ("REX") by its former parent company, Defendant Caliber System, Inc.[1] ("Caliber"), and the precipitous decline in the price of Caliber stock between July 1996 and August 1996 following the spinoff.  Plaintiffs, employees of REX, alleged in their complaints that in connection with the spinoff, Defendants committed various breaches of fiduciary duty and other violations under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 to 1461 ("ERISA").  Plaintiffs claim they lost substantial amounts in their retirement accounts when the

———————————

[1]Caliber was known as Roadway Services, Inc. prior to the spinoff. The name of the company was changed to Caliber after the spinoff.  For the sake of clarity, we will refer to the company throughout this Opinion as Caliber.

evidence sufficient to create a genuine issue of material fact. Plaintiffs do not assert any error in that ruling on appeal. Thus, Plaintiffs' claim fails regardless of whether Caliber actually informed Plaintiffs of the amendment.

In addition, the district court properly held that Plaintiffs failed to present evidence showing that Caliber made any misrepresentations to Plaintiffs. The evidence cited by Plaintiffs simply informed participants of when the distribution was expected to occur. Caliber never told participants that they could not request an early distribution, and based on the pre-amendment language giving participants the right to request an early distributions, participants had no reason to believe that they could not apply for an early distribution.

## V.

For the foregoing reasons, the judgment of the district court is AFFIRMED.[8]

---

[8]Because we affirm the dismissal of all claims, we find it unnecessary to address the Plaintiffs' remaining issues.

price of Caliber stock declined because Caliber denied Plaintiffs a lump sum distribution of their account balances and REX delayed allowing Plaintiffs the opportunity to either sell or withdraw their Caliber stock. After certifying a class with regard to issues of liability, the district court granted summary judgment to Defendants on all claims. For the reasons that follow, we affirm the judgment of the district court.

## I.

Plaintiffs are non-union employees of REX. Prior to January 1, 1996, REX was a wholly-owned subsidiary of Caliber. As a subsidiary of Caliber, REX was a participating employer in three tax-qualified employee benefit plans sponsored by Caliber (collectively the "Caliber Plans") known as the Roadway Services, Inc. Stock Bonus Plan and Trust ("SBP"), the Roadway Services, Inc. Stock Savings and Retirement Income Plan ("SSRIP"), and the Roadway Services, Inc. Employee Stock Ownership Plan ("ESOP"). Each of the Caliber Plans was an "individual account plan" or a "defined contribution plan," meaning that a participant in each plan had an individual account and benefits were based solely upon contributions made to the participant's account. *See* 29 U.S.C. § 1002(34). Plaintiffs were participants in one or more of the Caliber Plans.

During the summer of 1995, Caliber adopted a plan to divest itself of REX by distributing REX stock to Caliber's shareholders. Caliber's board of directors adopted the spinoff as a solution to an intra-corporate problem created by deregulation in the trucking industry, which pitted REX and other Caliber subsidiaries against each other as business competitors. Consequently, REX's status as a Caliber-owned company presented an obstacle to REX management's implementation of an effective incentive compensation program that was tied to the performance of other members of Caliber's corporate family. As a solution to the problem, REX management formulated a plan for separating ownership

of REX from Caliber. Caliber's board of directors ultimately adopted the plan, which called for a tax-free distribution of REX stock by Caliber to Caliber's shareholders, including the Caliber plans.

The spin-off occurred on January 2, 1996. Following the spin-off, all REX employees continued in their employment with REX in the same positions they had held prior to the spin-off. Thus, REX employees did not experience any change in their employment. In preparation for the spin-off, Caliber and REX executed an agreement on December 29, 1995, titled "Agreement on Employee Matters" ("Agreement"), which, among other things, provided that REX would establish a new 401(k) individual account retirement plan (the "401(k) Plan" or "Plan") to accept from the SSRIP and SBP transfers of assets attributable to the accounts of REX employees. Paragraphs 2.2(b) and (c) of the Agreement permitted the transfer of assets from the SSRIP and the SBP "in cash, securities or other property or a combination thereof, as reasonably determined by [Caliber] and acceptable by the" trustee of the 401(k) Plan. (Agreement §§ 2.2(b), (c), J.A. 868-69.) In addition, the parties agreed that neither party would be obligated to proceed with the transfer of assets until the parties received either a favorable determination letter from the Internal Revenue Service ("IRS") or an opinion of counsel that the 401(k) Plan met the Internal Revenue Code requirements for status as a qualified plan. *See id.* (§ 2.2(e), J.A. 869.) The parties also agreed that Caliber would amend the SSRIP and the SBP to provide that any participant employed by REX on January 1, 1996, would not be eligible to receive benefits from the SSRIP or the SBP until the individual terminated his or her employment with REX after December 31, 1995. (*See id.* § 2.2(f), J.A. 869.) At or about the time Caliber and REX signed the Agreement, Caliber adopted written amendments to the SSRIP and the SBP (the "December Amendments") which, as specified in the Agreement, amended the SSRIP and the SBP to provide that participants employed by REX on January 1, 1996, were not eligible to receive distributions of their account balances

Regardless of whether Caliber complied with ERISA's disclosure requirements, the district court properly granted summary judgment to Caliber. Plaintiffs' claim is that the ESOP was amended to provide for "an immediate post-spinoff distribution to plan participants." (Appellants' Br. at 54.) However, Plaintiffs' interpretation of the amendment is wrong. Under the pre-amendment version of the ESOP, Plaintiffs had the right to request an early distribution, although there was no guaranty that the request would be granted. If the request was not granted, the participant would have to wait until the normal June distribution was made. The ESOP amendment merely allowed for the possibility of a distribution sooner than normal if "practicable." Nothing in the language suggests, as Plaintiffs contend, that participants were entitled to an immediate distribution or even one soon after the request was made.

The district court also granted summary judgment on the basis that Caliber's evidence sufficiently established that a distribution of ESOP accounts prior to the end of August 1996, when the distribution actually occurred, would not have been "practicable." The evidence demonstrated that Caliber had initially targeted the end of March 1996 for an ESOP distribution but was unable to provide the necessary information on the approximately 3,000 account holders to the ESOP trustee in time to meet that deadline. By late April or May, Caliber determined that the normal June distribution could not be made due to a number of spin-off-related tasks that had to be completed. Therefore, when Caliber mailed out the participants' 1995 statements to them in late May or early June, it informed the participants that they would receive information regarding distributions by the end of July and that distributions would begin to occur at the end of August. Caliber mailed information packets to participants on July 24, 1996, and distributions commenced on August 30, 1996. Based on that evidence, the district court concluded that Caliber demonstrated that it would not have been "practicable" to make distributions prior to August 1996. The district court also noted that Plaintiffs failed to present

participant filed his application for distribution. (ESOP Amendment No. 1 § 7, J.A. 567.)

The district court found that because participants were notified of the amendment by late May or early June, Caliber complied with ERISA's requirement that it inform the ESOP participants of the amendment within 210 days after the end of the plan year in which the amendment was adopted. *See* 29 U.S.C. §§ 1022(a), 1024(b)(3). On that basis, the district court held that under *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), Caliber had no duty to disclose plan amendments beyond that required by ERISA's statutory requirements. Plaintiffs note on appeal that there was no evidence in the record to support the district court's conclusion that Caliber actually complied with ERISA's disclosure requirements. Our own review of the record indicates that Plaintiffs are correct. In fact, the district court confirmed this much in its opinion when it stated that Caliber "maintains that the participants were advised of the amendment in late May or early June" without citing any evidence. The district court accepted Caliber's statement as an undisputed fact because Plaintiffs failed to produce any evidence to rebut Caliber's statement. This, however, was erroneous, because Caliber, as the party moving for summary judgment, had the initial burden of production and persuasion on the motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331-32, 106 S. Ct. 2548, 2557 (1986). In order to carry its burden of establishing the fact that it complied with ERISA's disclosure requirements, Caliber was required to produce evidence showing that it actually did so. *See id.* at 331, 106 S. Ct. at 2557. Therefore, Plaintiffs were not required to present evidence. "If a moving party fails to carry its initial burden of production, the non-moving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

until their employment with REX terminated after December 31, 1995. The purpose of the amendments was to clarify that REX employees did not incur a termination of their employment as a result of the spin-off and therefore were not entitled to a distribution of their SSRIP and SBP accounts.

REX adopted the 401(k) Plan and received a favorable determination letter from the IRS as well as an opinion of counsel indicating that the 401(k) Plan met the requirements for qualified plans. Pursuant to the Agreement, Caliber transferred the assets of the SSRIP to the 401(k) Plan on April 2, 1996. Caliber transferred the SBP assets to the 401(k) Plan in late April and early May of 1996. The transferred assets consisted of approximately 6 million unregistered shares of Caliber stock, 3 million shares of shares of REX stock, and cash. The 6 million shares of Caliber stock represented approximately 15% of Caliber's outstanding shares of stock. Key Trust, the 401(k) Plan trustee, reconciled the participants' accounts, which numbered approximately 5,000, by June 12, 1996.

During the reconciliation process, REX learned from its counsel that because of the size of the 401(k) Plan's Caliber holdings, the 401(k) Plan was deemed an "affiliate" of Caliber under the federal securities laws. As a consequence of its affiliate status, the 401(k) Plan could not sell the unregistered Caliber stock, except in small amounts each quarter, and, thus, the Plan participants could not diversify the Caliber stock in their accounts as allowed under the terms of the Plan. Between May and June of 1996, REX officials explored various options for solving that problem. On June 28, 1996, the REX board of directors decided to amend the 401(k) Plan to allow certain eligible participants to withdraw their Caliber stock and to give participants who desired to sell their Caliber stock within the 401(k) Plan more options for reinvestment of the sale proceeds. The board of directors anticipated that the amendment allowing withdrawals would solve the affiliate problem by reducing the 401(k) Plan's Caliber holdings below the 10% level giving rise to affiliate status, thus permitting the

401(k) Plan to freely sell the Caliber stock. REX notified the participants of the changes to the 401(k) Plan on July 5, 1996. Plan participants were thus permitted to begin making withdrawal elections in early August, 1996, and the Plan began acting on those elections on August 28, 1996.

Unlike the SSRIP and the SBP, Caliber decided to distribute the assets of the ESOP to participants rather than transfer them to the 401(k) Plan. The decision to distribute assets was based on the small size of the account balances and the fact that the ESOP had been frozen for approximately nine years due to a change in the tax laws. On December 20, 1995, Caliber adopted an amendment which, effective January 1, 1996, amended the ESOP to provide that the spin-off would result in a termination of employment for REX employees, giving participants a right to a distribution, and also that a participant's account would be distributed "as soon as practicable after the Participant has filed his application with the Plan Administrator . . . ." (ESOP Amendment No. 1 § 7, J.A. 567.) The first ESOP distribution was made to REX employees on August 30, 1996.

The primary impetus behind Plaintiffs' claims occurred on July 1, 1996, when Caliber announced that its second quarter earnings would be $.01 per share less than had been anticipated. Within a few weeks after the announcement, Caliber stock had fallen from around $34 per share to approximately $17 per share.[2] Plaintiff Hunter and other participants elected to withdraw their Caliber stock from the 401(k) Plan and sold it at or around $17.50 per share. However, by October of 1997, Caliber stock had rebounded to $60 per share. Thus, participants who held their Caliber stock until that time realized a significant gain.

---

[2]Plaintiffs note that they could have sold their Caliber stock for as much as $48 per share had they received it immediately after the spin-off.

received in this case fall into that category of legitimate benefits.[7]

**D.**

Plaintiffs also contend that the district court erred in dismissing its claim that Caliber breached its fiduciary duties by failing to disclose to participants the amendment to the ESOP which provided for a distribution "as soon as practicable . . . ." Plaintiffs allege that Caliber breached its fiduciary duties in two ways: (1) by failing to notify the participants of the amendment giving them the right to an early distribution of their accounts; and (2) by misleading them into believing that they would not be eligible to obtain a distribution until at least July 1996. Plaintiffs claim that had Caliber disclosed the amendment, they would have requested distribution of their accounts in time to sell their Caliber shares before Caliber's July 1 earnings announcement.

The pre-amendment version of the ESOP provided for distributions "as soon as practicable after the Participant has filed his application with the Plan Administrator . . . but in no event before the June of the year following the year in which the Participant has a Termination of Employment." (ESOP § 7.2, J.A. 521.) A participant was entitled to request distribution at an earlier time, but Caliber was not obligated to honor the request. (*See id.*, J.A. 521-22.) The amendment to the ESOP provided that a REX participant would be entitled to a distribution "as soon as practicable" after the

---

[7]Plaintiffs cite *Donovan v. Bryans*, 566 F. Supp. 1258 (E.D. Pa. 1983), *Freund v. Marshall & Ilsley Bank*, 485 F. Supp. 629 (W.D. Wisc. 1979), and *Marshall v. Kelly*, 465 F. Supp. 341 (W.D. Okla. 1978), for the broad proposition that a violation of § 1106 may result from an omission as well as an act. While that proposition is true, the key difference between those cases and this case is that the fiduciaries in those cases failed to act with respect to a prior transaction that was itself prohibited under § 1106. Here such a prior transaction never occurred.

further its goal of limiting Plan ownership of Caliber stock to 30%.

The district court properly rejected Plaintiffs' claim for a number of reasons. First, by its own terms, § 1106 applies only to those who act in a fiduciary capacity. Therefore, our prior conclusion that Caliber was not acting in a fiduciary capacity when it transferred assets to the 401(k) Plan bars any such claim. Second, as we have also noted, REX delayed but did not refuse to permit diversification, and there is no evidence that the reason for the delay had anything to do with REX's desire to limit Plan ownership of REX stock to 30%. Third, Plaintiffs failed to identify a transaction falling within § 1106 in which either Caliber or REX engaged. In *Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S. Ct. 1783 (1996), the Court described the types of transactions set forth in § 1106(a) as "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed Corp.*, 517 U.S. at 893, 116 S. Ct. at 1791. The common thread in these transactions is that they "generally involve uses of plan assets that are potentially harmful to the plan." *Id.*; *see also Marks v. Independence Blue Cross*, 71 F. Supp.2d 432, 438 (E.D. Pa. 1999)(mem. op.)("Section 1106(a) forbids 'sweetheart' deals between fiduciaries and parties in interest to an ERISA plan"). Neither Caliber's act of transferring unregistered Caliber stock to the 401(k) Plan nor REX's delay of diversification constitutes, either directly or indirectly, a "transaction" under § 1106. To the extent that Caliber and REX benefitted at all in this case, it was merely incidental to their operation of employee benefit plans. *Lockheed Corp.* recognizes that there are numerous "legitimate benefits that a plan sponsor may receive from the operation of a pension plan" which occur merely because the plan sponsor offers benefits to its employees. *Lockheed Corp.*, 517 U.S. at 893, 116 S. Ct. at 1791. The benefits Caliber and REX are alleged to have

## II.

On November 18, 1996, Plaintiff Hunter filed a seventeen count complaint against Caliber, REX, Key Trust, National City Bank (the trustee of the Caliber Plans), and the Caliber Plans alleging that Defendants breached their fiduciary duties and engaged in prohibited transactions in violation of ERISA. The Allison Plaintiffs filed their twenty-three count class action complaint on March 18, 1997, against the same Defendants sued by Hunter with the exception of the 401(k) Plan alleging the same claims as Hunter and some additional claims under ERISA. The Allison Plaintiffs filed an amended complaint on August 25, 1997, which added a claim that Caliber violated ERISA § 204(g), 29 U.S.C. § 1054(g), by amending the SSRIP and the SBP to deny Plaintiffs an immediate distribution of their individual accounts. On December 10, 1997, the district court certified a class with respect to issues of liability and consolidated the two cases.

On December 23, 1998, the district court issued an opinion and order denying Plaintiffs' motion for summary judgment and granting Caliber's motion for summary judgment on Count XX of Plaintiffs' amended complaint, which alleged that Caliber violated ERISA's "anti-cutback provision," 29 U.S.C. § 1054(g), by amending the SBP and the SSRIP to eliminate Plaintiffs' right to an immediate distribution of their individual accounts as a result of the spin-off. The district court concluded that Caliber did not violate § 1054(g) because Plaintiffs were not entitled to a distribution of their individual accounts as a result of the spin-off under the pre-amendment versions of the SBP and the SSRIP. In a subsequent opinion issued on January 27, 1999, the district court granted the Caliber Plans' motion for summary judgment on the bases that, among other things, the Caliber Plans were not fiduciaries and thus could not be held liable for breach of fiduciary duty and that Plaintiffs did not have standing to assert claims for benefits against the Caliber Plans.

Following the close of discovery, Caliber and REX moved for summary judgment on Plaintiffs' remaining claims. On March 31, 1999, the district court issued opinions and orders granting summary judgment to Caliber and REX on all remaining claims. With respect to Caliber, the district court concluded that Caliber's decisions regarding the trust-to-trust transfer, the form of the assets transferred, and the level of staffing devoted to accomplish the transfer were business decisions not subject to fiduciary standards. The district court also concluded that even if such decisions were fiduciary in nature, Plaintiffs failed to present any evidence showing that Caliber violated its fiduciary duties. In addition, the district court rejected Plaintiffs' allegations that Caliber engaged in prohibited transactions involving plan assets for a number of reasons, but primarily because Plaintiffs failed to identify a transaction covered by 29 U.S.C. § 1106(a) and (b). Finally, the district court rejected Plaintiffs' claims relating to the ESOP on the grounds that Caliber advised participants of the amendment to the ESOP within the time provided by ERISA, that an earlier distribution of Plaintiffs' ESOP accounts was not "practicable," and that Plaintiffs failed to present any evidence showing that Caliber made misrepresentations to Plaintiffs' regarding their right to request an early distribution of their ESOP accounts.

As for REX, the district court concluded that REX's decision to accept unregistered Caliber stock to fund the 401(k) Plan was a business decision, and that even if the decision was a fiduciary decision, Plaintiffs presented no evidence that REX breached its fiduciary duty. Similarly, the district court held that REX did not breach its duty to diversify the 401(k) Plan's assets by failing to allow participants to diversify their accounts earlier than August of 1996 because REX had to address the securities law obstacle to sale of the Caliber stock and there was no evidence that REX was aware of the securities law problem prior to May of 1996. The district court also found that REX complied with the terms of the 401(k) Plan by commencing diversification in August of 1996, that REX properly investigated solutions

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
  (A) sale or exchange, or leasing, or any property between the plan and a party in interest;
  (B) lending of money or other extension of credit between the plan and a party in interest;
  (C) furnishing of goods, services, or facilities between the plan and a party in interest;
  (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or
  (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 407(a).

\*\*\*\*

**(b) Transactions between plan and fiduciary.** A fiduciary with respect to a plan shall not –
  (1) deal with the assets of the plan in his own interest or for his own account,
  (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
  (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. §§ 1106(a)(1), (b). Plaintiffs contend that Caliber engaged in a prohibited transaction when it transferred unregistered stock to the 401(k) Plan, because by using unregistered stock it was able to prop up the price of its stock. Similarly, Plaintiffs argue that REX engaged in a prohibited transaction by refusing to permit diversification in order to

initially took on the issue by contacting Goldman Sachs, "it was a [REX] issue." (Cunningham Dep. at 76, J.A. 1107.) That much is demonstrated by REX's independent meetings with financial advisors and legal counsel and the five board meetings during May and June.

Plaintiffs' final breach of fiduciary duty argument is that REX breached its duty of loyalty to Plan participants. We have already addressed and rejected many of the bases of Plaintiffs' divided loyalty argument. Plaintiffs' primary assertion is that REX's interest in limiting Plan ownership of REX stock to 30% caused REX to favor itself at the Plan and its participants' expense. This argument, like others, is not supported by evidence in the record. Although Plaintiffs did offer evidence showing that REX officials had discussed a 30% limitation at some point in time, there is no evidence showing that REX ever did adopt such a limitation or that the 30% limitation had anything at all to do with REX's decision not to implement diversification immediately. REX had legitimate concerns to address and acted prudently, as demonstrated by its actions. Finally, Plaintiffs' claim must fail because the proposed limitation on the Plan's ownership of REX stock would have constituted a matter of plan design, which is not a fiduciary function. *See Becher v. Long Island Lighting Co.* (*In re Long Island Lighting Co.*), 129 F.3d 268, 271 (2d Cir. 1997). Therefore, the fact that REX may have been simultaneously considering such an amendment would not give rise to a breach of fiduciary duties.

### C.

Plaintiffs also contend that the district court erred in concluding that Caliber and REX did not engage in prohibited transactions in violation of 29 U.S.C. § 1106. That section provides, in relevant part:

**(a) Transactions between plan and party in interest.**
Except as provided in section 408:

for the diversification problem, and that REX did not breach its duty of loyalty to Plan participants. Finally the court rejected Plaintiffs' prohibited transaction claims for the same reasons it rejected those claims against Caliber.[3]

### III.

Plaintiffs contend that the district court erred in granting summary judgment to Defendants on their various claims. In reviewing a district court's grant of summary judgment, this Court applies a *de novo* standard. *See Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir. 1999). Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). When faced with a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence in order to avoid summary judgment. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). In considering whether the non-moving party has met its burden, we must construe the evidence and draw all inferences in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 254-55, 106 S. Ct. at 2513.

### IV.

### A.

Plaintiffs first argue that the district court erred in granting summary judgment to Caliber on their claim that Caliber violated ERISA's anti-cutback provision by eliminating Plaintiffs' right to lump sum distributions of their individual accounts under the SSRIP and the SBP. As an initial matter,

---

[3]The district court also rejected several other claims which are not raised on appeal.

we must address Plaintiffs' argument that the district court erred in applying the arbitrary and capricious standard in reviewing this claim.

**1.**

A *de novo* standard of review applies to decisions by plan administrators "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998). However, where the plan clearly confers discretion upon the administrator to determine eligibility or construe the plan's provisions, the determination is reviewed under the "arbitrary and capricious" standard. *See Wells v. United States Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1248 (6th Cir. 1991). "'The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989)(quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)). Our review of the district court's determination of the proper standard of review is *de novo*. *See Tiemeyer v. Community Mut. Ins. Co.*, 8 F.3d 1094, 1099 (6th Cir. 1993).

The district court held that the arbitrary and capricious standard of review applies because Plaintiffs' claim that Caliber violated § 204(g) requires interpretation of the Caliber Plans to determine whether Plaintiffs had a pre-amendment right to a lump sum distribution. The district court based its conclusion upon § 10.9 of the SBP and § 11.9 of the SSRIP, which grant the plan review committees "sole and absolute discretion to interpret the provisions of the Plan (including, without limitation, by supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in,

correctly noted, Key Trust was not a directed trustee under 29 U.S.C. § 1103(a)(1) because, while REX reserved to itself responsibility for designating investment funds under § 3.2 of the Trust Agreement, it was not responsible for diversifying those funds.

Plaintiffs also contend that REX breached its duty to act prudently by failing to investigate how to resolve the diversification issue in the manner most beneficial to the Plan and participants. Plaintiffs contend that REX breached its duty of prudence because REX never conducted an investigation that focused on the Plan, did not retain financial advisors or independent legal counsel for the Plan or its fiduciaries, essentially ignored its own duties by delegating the diversification issue to Caliber, and the Plan Administrative Committee never met. The evidence in the record soundly refutes Plaintiffs' allegations. The test for determining whether a fiduciary has satisfied his duty of prudence is "'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Fink v. National Sav. & Trust Co.*, 772 F.2d 951, 955 (D.C. Cir. 1985)(quoting *Mazzola*, 716 F.2d at 1232). The undisputed evidence shows that after REX became aware of the securities law issue in May, REX met with two prominent investment advisors and legal counsel in order to explore alternatives for addressing the diversification issue. REX also held five board meetings to discuss the issue before finally adopting the Plan amendment on June 28. Plaintiffs' argument that REX's board met on those occasions principally to discuss REX's corporate objective of limiting the Plan's ownership of REX stock to 30% is without support in the record. It is also of no consequence that the Plan Administrative Committee did not conduct any formal meetings, because REX itself was the plan sponsor and addressed the issue at the highest level in its board meetings. Finally, REX did not hand the diversification issue over to Caliber as Plaintiffs suggest. J. Dawson Cunningham, REX's CFO, testified that although Caliber

facto rather than at the time it occurred. *See Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)("The court's task is to inquire 'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment'")(quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)). The fact that the problem could have been solved by other means does not render REX's decisions imprudent or unreasonable. *See Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997)(noting that "plan fiduciaries can make honest mistakes that do not detract from a conclusion that their decisions were prudent at the time the investment was made").

Plaintiffs next argue that REX breached its duty to diversify the Plan's assets. In light of our discussion above, we find this argument simply untenable. REX *did* diversify its Caliber holdings. Plaintiffs' argument is really that REX did not diversify soon enough. However, given the legal and market issues REX faced, REX acted properly in adopting a diversification plan sixteen days after the earliest date diversification could have begun which provided for diversification to commence in August. Nothing in the record indicates that REX could or should have anticipated Caliber's July 1 announcement that its second quarter earnings would be off $.01 per share or that the market's reaction to the news would lead to a 50% decline in the price of the stock before participants would be able to sell their Caliber stock.

REX also cannot be held liable for failing to diversify the Plan assets for another reason: Key Trust, the Plan trustee, had the sole responsibility for diversifying Plan investments under ERISA. *See* 29 U.S.C. § 1103(a). The Trust Agreement between REX and Key Trust also assigns responsibility to Key Trust for diversification. (*See* Trust Agreement § 3.4, J.A. 742 (stating that Key Trust shall "diversify[] the investments of the Trust so as to minimize the risk of large losses . . . .").) Furthermore, as the district court

the language of the Plan) . . . ." Plaintiffs do not question the district court's conclusion that the sections of the SBP and SSRIP cited above grant Caliber discretion to interpret the terms of those plans. Rather, Plaintiffs argue that the arbitrary and capricious standard is appropriate only in cases involving benefit determinations by fiduciaries and that a *de novo* standard is appropriate where the issue is whether the plan complies with one of ERISA's statutory requirements.

*Firestone* marked a significant departure from ERISA principles adopted by the lower courts to review benefit determinations by plan fiduciaries. Prior to that time, in reviewing whether a plan administrator's decision to deny benefits should be upheld under ERISA, courts, including this one, generally applied the arbitrary and capricious standard of review employed in cases under the Labor Management Relations Act ("LMRA"). *See Firestone*, 489 U.S. at 109, 109 S. Ct. at 953; *Ross v. Pension Plan for Hourly Employees of SKF Indus., Inc.*, 847 F.2d 329, 334 (6th Cir. 1988)(stating that "[j]udicial review of a plan administrator's decision to deny benefits is limited to a determination of whether the denial of benefits was arbitrary and capricious"); *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)("[t]his court has held repeatedly that the appropriate determination in reviewing the decision of a plan administrator with respect to a claim for benefits is whether the decision was arbitrary, capricious, made in bad faith or otherwise contrary to law"). However, the Court observed that "*wholesale* importation of the arbitrary and capricious standard into ERISA [was] unwarranted" because unlike the LMRA, § 502(a) of ERISA, 29 U.S.C. § 1132(a), contains an express grant of jurisdiction over claims against fiduciaries and plan administrators to redress violations of ERISA, enforce compliance with the terms of a plan, and review benefit denials. *Firestone*, 489 U.S. at 109-10, 109 S. Ct. at 953-54 (emphasis in original). Instead, the Court looked to principles of trust law, which "abound[]" throughout ERISA, and concluded that a fiduciary's decisions should be reviewed under a *de novo* standard unless the plan's language grants the administrator or

fiduciary discretion to determine eligibility benefits or construe the terms of the plan. *Id.* at 110-12, 115, 109 S. Ct. at 954-56.

Plaintiffs contend that because the Court limited its holding in *Firestone* "to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations," *id.* at 108, 109 S. Ct. at 953, the district court erred in applying the arbitrary and capricious standard because this is not a benefits case. We reject this argument. As the district court noted, Plaintiffs alleged under Count XX of their first amended complaint that their § 204(g) claim was brought under § 1132(a)(1)(B). Therefore, this case *is* about benefits, and *Firestone* requires application of the arbitrary and capricious standard if required by the language of the plan.

More importantly, we find no barrier to application of the arbitrary and capricious standard in a case such as this not involving a typical review of denial of benefits. *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995), a case cited by Plaintiffs, supports this result. In *Moench*, the Third Circuit was confronted with a claim that the employee stock option plan committee breached its fiduciary duties under ERISA by failing to diversify the assets in the plan, which were invested entirely in the employer's stock. The plaintiff argued that despite language in the plan requiring the plan committee to invest only in the employer's securities, in the face of a substantial decline in the price of the employer's stock and knowledge of the employer's financial difficulties, the committee should have invested the plan assets in other securities. A subsidiary issue was whether the arbitrary and capricious standard should be applied to a breach of fiduciary duty claim. The court first addressed the plaintiff's argument that the court's prior opinion in *Struble v. New Jersey Brewery Employees' Welfare Trust Fund*, 732 F.2d 325 (3d Cir. 1984), required application of the *de novo* standard. *Struble*, a pre-*Firestone* case, held that use of the arbitrary and capricious standard is inappropriate in breach of fiduciary duty cases

---

Even in the absence of express language permitting REX to designate a different date for processing of transfer requests, REX's decision to delay implementing diversification of the Caliber stock was prudent in light of the legal restraints on sale of the stock imposed by the securities laws and the potential for a sharp decrease in the price of Caliber stock if a large block was sold. A fiduciary is only bound to follow plan terms that are consistent with ERISA. *See Kuper*, 66 F.3d at 1457. By commencing diversification as urged by Plaintiffs, REX would have ignored its duty of prudence in administering the plan. *See* 29 U.S.C. § 1104(a)(1)(B). The earliest date diversification became possible was June 12, 1996, when the Plan trustee completed its reconciliation of the accounts. Even prior to that date, REX began investigating various possibilities for overcoming the impediments to diversification. REX met with prominent investment advisors, Goldman Saks and Donaldson, Luffkin & Jenrette, to consider the possibility of hiring an investment advisor to assist the Plan trustee in disposing of Caliber stock. In those meetings, REX learned that due to the size of the Plan's Caliber holdings and the average volume of Caliber stock, it would not be possible for the Plan to immediately sell any substantial portion of Caliber stock without impacting the market price of the stock. REX also learned that a managed sale would have to occur over one and one-half to two years. In addition, REX learned that there was an insufficient amount of REX stock in the market available for purchase if the Plan sold a large block of Caliber stock. Slightly more than two weeks after the accounts were reconciled, REX solved the diversification problem by adopting an amendment which allowed participants to withdraw their Caliber stock commencing in August and provided more options for reinvesting the proceeds. Given the complex issues involved, the brief delay in implementing the diversification plan was both reasonable and prudent.

Plaintiffs cite other solutions that REX could have adopted to commence diversification in July. The problem with this approach is that it requires us to assess REX's conduct post

who in bad faith fails to follow the terms of the plan may be held liable for the consequences of his failure to do so.  *See Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 170 (3d Cir. 1999).  "An essential element of [such a claim] is that the [fiduciary] in fact failed to follow the terms of the plan."  *Id.*

Plaintiffs' claim fails primarily because they cannot show that REX failed to follow the terms of the 401(k) Plan. Plaintiffs cite 401(k) Plan § 7.8(c) as the basis for their claim. That provision states:

> [A]ny direction to transfer . . . all or a portion of a Participant's Account invested in the Caliber Stock Fund to the Company Stock Fund which are received and acknowledged by the Plan Administrator within such period established by the Plan Administrator prior to the first day of any January, April, July or October (*or such other date as the Plan Administrator may designate*), shall be effected during such month, based upon the number of shares in the Account (or applicable portion thereof) as of the end of the immediately preceding calendar quarter *or such other date as may be . . . designated by the Plan Administrator*.

(401(k) Plan § 7.8(c), J.A. 632 (emphasis added).)  Although § 7.8(c) provides that Caliber shares may be exchanged for REX shares on a quarterly basis, the language in that provision authorizes REX, as plan administrator, to designate a different exchange date.  The 401(k) Plan Summary Plan Description contains similar language stating that "transfer[s] in investments will occur on the first day of any calendar quarter (or on any other date the Plan Administrator may designate) after a Participant's directions have been received . . . ."  (401(k) Plan Summary Plan Description at 10, J.A. 705.)  Because the plan language allowed REX to establish alternate transfer dates, REX's decision to diversify at the end of August instead of July was not a failure to follow the plan.

where the fiduciary acts in a manner that sacrifices the interests of all beneficiaries to those of non-beneficiaries – in that case, the group of employers.  *See Struble*, 732 F.2d at 333-34.  The *Moench* court found *Struble* distinguishable on the basis that the plaintiff in *Moench* was not alleging that the fiduciaries acted in a manner that benefitted non-beneficiaries over beneficiaries.  The court then continued on to assess the impact of *Firestone* on *Struble*.  Noting that *Firestone* directs courts to look to the common law of trusts, the court concluded that *Firestone* mandated neither the arbitrary and capricious standard nor the *de novo* standard in breach of fiduciary duty claims.  *See Moench*, 62 F.3d at 565.

> While the *Firestone* Court "express[ed] no view as to the appropriate standard of review for actions under other remedial provisions of ERISA," the Court's mode of analysis is certainly relevant to determine the standard of review pertaining to all claims filed under ERISA challenging a fiduciary's performance.  Specifically, the Court looked to trust law in large part because the terms used *throughout* ERISA – participant, beneficiary, fiduciary, trustee, fiduciary duties – are the "language and terminology of trust law."  That being the case, we believe that after *Firestone*, trust law should guide the standard of review over claims, such as those here, not only under section 1132(a)(1)(B) but also over claims filed pursuant to 29 U.S.C. § 1132(a)(2) based on violations of the fiduciary duties set forth in section 1104(a).

*Id.* at 565 (quoting *Firestone*)(citations omitted)(emphasis in original).

We agree with *Moench*'s analysis of *Firestone* and find it consistent with our prior decisions applying the arbitrary and capricious standard outside of the benefits denial context.  For example, in *Whisman v. Robbins*, 55 F.3d 1140 (6th Cir. 1995), we affirmed the district court's use of the arbitrary and capricious standard in a claim alleging that an employer's

suspension of benefits being paid to a participant violated ERISA § 203(a), 29 U.S.C. § 1053(a), and the relevant Department of Labor Regulations. *See id.* at 1143-44.[4] We have also applied this standard to breach of fiduciary duty claims. *See, e.g.*, *Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 140 (6th Cir. 1993). We find no reason to apply a different rule in this case, which involves a statutory provision similar to that in *Whisman*.

Plaintiffs also argue that the district court erred in concluding that the arbitrary and capricious standard applies because there was no evidence that the administrative committees for the Caliber Plans did in fact interpret the plans. "The deferential standard of review of a plan interpretation 'is appropriate only when the trust instrument allows the trustee to interpret the instrument *and when the trustee has in fact interpreted the instrument*.'" *Moench*, 62 F.3d at 567 (quoting *Trustees of Central States, Southeast and Southwest Areas Health & Welfare Fund v. State Farm Mut. Auto Ins. Co.*, 17 F.3d 1081, 1083 (7th Cir. 1994))(emphasis in original). The district court found that the December Amendments themselves constituted interpretations or clarifications of the effect of the spin-off on the status of REX employees' employment under the terms of the plans. Plaintiffs argue that the December Amendments cannot be construed as an interpretation because an amendment, by definition, *changes* rather than interprets. However, "[a]n erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an 'amendment' for the purposes of ERISA § 204(g)." *Hein v. FDIC*, 88 F.3d 210, 216 (3d Cir. 1996). We see no reason why an amendment that interprets a plan may not likewise be considered an "amendment" for purposes of § 204.

---

[4]At least one other circuit court has applied the arbitrary and capricious standard in reviewing a claim under § 204(g). *See Counts v. Kissack Water & Oil Serv., Inc.*, 986 F.2d 1322, 1324 (10th Cir. 1993).

fifteen percent of Caliber's outstanding stock) transferred to the 401(k) Plan could have negatively impacted the price of Caliber stock – a consequence which could have affected all shareholders, including participants in the SSRIP, the SBP, and the 401(k) Plan. Plaintiffs' own expert, Lewis Lowenfels, confirmed in his testimony that the impact on the stock price "is always a factor" in considering whether to register stock. (Lowenfels Dep. at 40, J.A. 1163.) Furthermore, as Plaintiffs acknowledge in their brief, REX had several other avenues available besides registration for dealing with the affiliate problem. And, registration remained a viable option even after the transfer because Caliber was willing to register enough stock to allow REX to reduce its Caliber holdings below the threshold for affiliate status and the registration process would have taken a relatively short time. Neither REX nor the 401(k) Plan Trustee ever requested Caliber to register the stock because REX ultimately chose to address the problem by amending its plan. Under these circumstances, Caliber's failure to register the stock was not a breach of its fiduciary duties.

**2.**

Plaintiffs also contend that REX breached its fiduciary duties in a variety of ways. Plaintiffs do not argue here, as they did in the district court, that REX breached its fiduciary duties by initially accepting the unregistered Caliber stock into the 401(k) Plan. Instead, their arguments concern REX's conduct following its receipt of the assets from Caliber.

We begin first with Plaintiffs' claim that REX failed to follow the terms of the 401(k) Plan by waiting until August to commence diversification instead of doing so immediately. An ERISA fiduciary is specifically charged with the duty to administer the plan "in accordance with the documents and instruments governing the plan" unless doing so would be inconsistent with ERISA's purposes. 29 U.S.C. § 1104(a)(1)(D); *see also McMillan v. Parrott*, 913 F.2d 310, 311 (6th Cir. 1990)(quoting § 1104(a)(1)(D)). A fiduciary

to the creation and funding of the plan when no fiduciary obligations existed. *See Akers*, 71 F.3d at 230. While it is true that we distinguished that case from other cases involving transactions with an established ERISA plan, we nonetheless conducted a functional analysis of the defendant's actions and concluded that they constituted the "act of a settlor, immune from scrutiny under Title I of ERISA." *Id.* at 230-31. A functional analysis in this case yields the same result because an employer's exercise of discretion in determining whether employer securities should be transferred to a new trust is incidental to the employer's business decision to make a trust-to-trust transfer.

The district court also correctly noted that the provisions of the Agreement which Plaintiffs cite left the final decision regarding the type of assets to be transferred to the 401(k) Plan solely in the hands of Key Corp., the 401(k) Plan trustee. Even though Caliber had some latitude in determining the composition of the transferred assets, the final decision whether those assets should be accepted was not Caliber's to make. Thus, Plaintiffs' complaint lies with Key Corp.

Our conclusion that Caliber did not act in a fiduciary capacity in deciding to transfer Caliber stock to the 401(k) Plan forecloses Plaintiffs' claim that Caliber breached its fiduciary duties by transferring unregistered stock. However, even if we determined that Caliber was acting in a fiduciary capacity, we would still find ample basis for affirming the district court. Plaintiffs contend that Caliber had an obligation to register the stock because it knew that the 401(k) Plan permitted diversification, that many REX participants would choose to diversify out of their Caliber stock, and that because registration would be necessary given the large percentage of stock, the 401(k) Plan would not be able to diversify the unregistered stock. The evidence in the record was more than sufficient to show that Caliber's decision not to register the shares was reasonable in light of all the circumstances. Caliber argued in the district court that registration of the large number of shares (amounting to

### 2.

Section 204(g)(1) of ERISA provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 302(c)(8) or 4281." 29 U.S.C. § 1054(g)(1). A plan amendment that eliminates "an optional form of benefit" is considered as reducing accrued benefits. *See* 29 U.S.C. § 1054(g)(2). Section 204(g) mirrors the anti-cutback provision found in § 411(d)(6) of the Internal Revenue Code, 26 U.S.C. § 411(d)(6). These anti-cutback provisions preclude retroactive application of amendments that eliminate or decrease certain types of benefits. *See Constantino v. TRW, Inc.*, 13 F.3d 969, 977 (6th Cir. 1994). A lump sum payment of benefits is considered "an optional form of benefit." *See* 26 C.F.R. § 1.411(d)-4, Q & A-1(b); *Counts*, 986 F.2d at 1324.

The task in applying § 204(g) in this case is to ascertain whether the pre-amendment versions of the SSRIP and the SBP gave Plaintiffs the right to a lump sum distribution of their accounts in the circumstances presented by the spin-off. General rules of contract interpretation incorporated as part of the federal common law of contract interpretation guide us in construing an ERISA plan. *See Perez*, 150 F.3d at 556. This means that we must interpret the Caliber Plans' "provisions according to their plain meaning, in an ordinary and popular sense." *Id.* The plain meaning approach requires us to "'give effect to the unambiguous terms of an ERISA plan.'" *Id.* (quoting *Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir. 1996)).

Plaintiffs contend that they were entitled to distribution of their accounts under the pre-amendment versions of the plans based upon two events: (1) REX's termination as a participating employer in the SSRIP and the SBP; and (2) their termination of employment from the "Controlled Group". Plaintiffs' first argument is based upon § 14.4 of the SBP and § 15.4 of the SSRIP, which address situations in

which an employer withdraws from the plan or the plan is terminated as to an employer.  Those sections, which contain essentially the same language, provide in part:

> In the event of such a withdrawal of an Employer, or in the event the Plan is terminated as to an Employer (but not all the Employers) pursuant to Section 12.1 (SSRIP Section 13.1), such Employer (here called "former Employer") shall cease to be an Employer, and Employer Contributions of such former Employer shall cease. *The interests in the Trust Fund of Participants who are or were Employees of such former Employer shall be distributed as specified in Article VII* (SSRIP Article VIII).

(SBP § 14.4, J.A. 317; SSRIP § 15.4, J.A. 464 (emphasis added).)   "Employer" includes Caliber and any other "Controlled Group Member" that has adopted the plan. (*See* SBP § 2.19, J.A. 239; SSRIP § 2.21, J.A. 378.)  The term "Controlled Group Member" includes all corporations and businesses owned by Caliber required to be treated as a single employer under the tax laws. (*See* SBP § 2.12, J.A. 235; SSRIP § 2.15, J.A. 374.)  REX ceased to be a "Controlled Group Member," and, therefore, an "Employer," as of the effective date of the spin-off, January 1, 1996.  *See* 26 U.S.C. §§ 414(b), 414(c), 1563(a)(1).  Plaintiffs contend that they were entitled to distributions under SBP § 14.4 and SSRIP § 15.4 as of January 1, 1996, because REX terminated its participation in the plans on that date.

With regard to the SSRIP, which we will discuss first, Caliber cites § 8.10, which states:

> In the event that a Participant's Termination of Employment is caused by the disposition by an Employer of substantially all of the assets of a trade or business, or its interest in a subsidiary, and such Participant continues employment with the entity acquiring such assets or such subsidiary, the Participant, if he so elects on an

---

We find Plaintiffs' argument unpersuasive.  As noted above, an employer's decision to transfer plan assets is not a fiduciary decision, *see Kuper*, 66 F.3d at 1456-57, although an employer's acts in furtherance of that decision may be subject to fiduciary duties, *see Senpiel*, 156 F.3d at 666.[6]  However, the mere fact that Caliber exercised some form of discretion is an insufficient basis for transforming a non-fiduciary act into a fiduciary act.  The discretion required to invoke ERISA's fiduciary obligations must relate to fiduciary functions such as "plan management or administration, or those acts designed to carry out the very purpose of the plan. . . ." *Id.*  As the district court observed, the Agreement upon which Plaintiffs rely was a business agreement between Caliber and REX regarding the details of the transfer.  Caliber's decision to transfer the REX employees' accounts intact pursuant to that agreement did not implicate fiduciary concerns because it did not involve investment of plan assets or plan administration.  On that basis, we believe that it is more appropriate to characterize such a determination as a settlor function rather than a fiduciary function.  In *Akers*, we held that the defendant did not breach his fiduciary duties in funding an employee stock option plan with newly issued stock valued at its market value of $10,000.  That decision rested upon the fact that the alleged breaches occurred prior

---

[6] *Sengpiel* cited the Supreme Court's decision in *Varity Corp. v. Howe*, 516 U.S. 489, 116 S. Ct. 1065 (1996), as an example of how an employer acts in a fiduciary duty in carrying out a business decision.  That case dealt with a situation in which the employer made misrepresentations to certain employees designed to induce those employees to accept employment with and a transfer of their employee benefits to a new corporation created by the employer to receive all of the unprofitable businesses and several large debts.  At the time it made assurances to the employees of the new corporation's financial viability, the employer was aware almost to a certainty that the new corporation was doomed to failure.  The Court held that the employer acted in its fiduciary capacity in communicating with the employees because it engaged in "plan-related activity" by furnishing them detailed information aimed at helping them decide whether to continue participation in the plan. *Varity*, 516 U.S. at 502-03, 116 S. Ct. at 1073.

court on the basis that Plaintiffs failed to present any evidence demonstrating that Caliber actually breached such duties. The Agreement between Caliber and REX provided that Caliber would transfer the assets and liabilities of the SBP and the SSRIP to the 401(k) Plan "[a]s soon as practicable" after the spin-off occurred. (Agreement § 2.2(b), J.A. 868.)  The only evidence Plaintiffs offered on the issue consisted of certain unauthenticated documents showing that several tentative transfer deadlines expired before the transfer was actually made.   Other evidence in the record suggests that those deadlines were simply target dates subject to extension based upon unexpected events or delays. (*See* Wickham Dep. at 10, J.A. 1201.)  Although Plaintiffs claim that the transfer did not occur in a timely fashion, they have not shown that the transfer should have occurred by a certain date or within a certain amount of time. Moreover, Plaintiffs' own expert was unable to opine that the amount of time taken to transfer the assets was unreasonably long.

Plaintiffs next argue that Caliber breached its fiduciary duties by transferring Caliber stock to the 401(k) Plan. The district court concluded that Caliber's decision to transfer Caliber stock was purely a business decision. Plaintiffs concede that Caliber did not have a duty to diversify the Caliber stock within the SBP or the SSRIP. They contend, however, that Caliber's decision regarding the form of the assets to be transferred to the 401(k) Plan was a fiduciary act by virtue of two provisions of the Agreement between Caliber and REX which required Caliber to direct the SSRIP and SBP Trustee to transfer to the 401(k) Plan assets in the form of "cash, securities or other property or a combination thereof, as reasonably determined by [Caliber] and acceptable by the [401(k) Plan Trustee], [in] an amount equal to the account balances attributable to REX Employees . . . ." (Agreement, §§ 2.2(b), (c), J.A. 868-69.) According to Plaintiffs, because Caliber exercised its discretion under these provisions in determining the form of the transferred assets, Caliber acted in a fiduciary capacity.

application filed with the Plan Administrator pursuant to Section 8.1, shall be entitled to a distribution of his Account pursuant to Section 8.2 only if such purchaser is not deemed to "maintain" the Plan in accordance with regulations issued under Code Section 401(k)(10).

The SBP does not contain a similar provision, apparently because the SBP is not a 401(k) plan.

Caliber asserts that § 8.10 precludes a distribution because applicable IRS regulations deem REX to have "maintained" the SSRIP because a transfer of assets and liabilities subject to § 414(l) of the Tax Code occurred.  The district court concluded that § 8.10 permits a distribution only in situations where a purchaser of the assets or subsidiary of an employer does not maintain a qualified § 401(k) plan that may accept a transfer of assets. Because REX maintained a 401(k) plan to which the accounts of REX employees were transferred, the district court held that a distribution was prohibited under the pre-amendment version.

Section 8.10 is very specific in the sense that it addresses how a participant's account is to be handled where Caliber sells substantially all of the assets of a business or a subsidiary, such as REX, and the participant continues to be employed by the purchaser. The language of that section makes it clear that under those circumstances a participant is not entitled to a distribution of his account if the purchaser maintains the plan in accordance with IRS regulations issued under IRC § 401. The applicable regulation provides that "[a] purchaser [] maintains the plan if the plan is merged or consolidated with, or any assets or liabilities are transferred from the plan to a plan maintained by the purchaser in a transaction subject to section 414(l)(1)." Treas. Reg. § 1.401(k)-1(d)(4).  Thus, under § 8.10 and the applicable rules promulgated by the IRS, Plaintiffs had no right to a lump sum distribution because their accounts were transferred to the 401(k) Plan, which is deemed to maintain the SSRIP. The circumstances in this case do not fit neatly within § 8.10

because REX was not a purchaser of assets or a subsidiary; rather, REX stock was distributed to Caliber shareholders but REX's corporate structure remained intact. However, because the SSRIP does not address spin-offs, the circumstances in § 8.10 are sufficiently analogous to those in this case to reasonably support Caliber's conclusion that Plaintiffs were not entitled to a distribution of their SSRIP accounts. Thus, without regard to other sections of the SSRIP, Plaintiffs' claim is barred by § 8.10.

Plaintiffs note that the SBP does not contain a provision similar to SSRIP § 8.10. Plaintiffs reason that they must have had distribution rights under SSRIP § 8.2 (addressing distributions upon termination of employment) or SSRIP § 15.4 because if they did not have distribution rights under those sections, § 8.10 would be mere surplusage. Plaintiffs assert that the absence of a similar provision in the SBP means that they had a right to a distribution of their SBP accounts under the provisions of the SBP corresponding to SSRIP §§ 8.2 and 15.4.

The problem with Plaintiffs' argument, which leads us to examine Plaintiffs' second basis for distribution rights, i.e., that there was a termination of employment, is that § 8.10 precludes distribution rights because it assumes that a "Termination of Employment" giving rise to distribution rights under § 8.2 has occurred. Thus, a participant may not have distribution rights under the SSRIP either because there was no "Termination of Employment" or because they are barred by § 8.10. "Termination of Employment" is defined as "the earlier of a Participant's cessation of active employment with the Controlled Group through quit, discharge, death or retirement or the date that is twelve (12) months after his last day worked with the Controlled Group." (SSRIP § 2.45, J.A. 385.) The SSRIP definition of "Termination of Employment" focuses on events upon which the participant actually stops working, i.e., quit, discharge, death, as well as events where the participant's relationship with the Controlled Group ends even though the participant continues to be employed. The

spite of knowledge that the employee's performance is inadequate. *See Schmidt*, 128 F.3d at 547-58. *Meinhardt v. Unisys Corp.* (*In re Unisys Savs. Plan Litig.*), 74 F.3d 420 (3d Cir. 1996), another case cited by Plaintiffs, is also distinguishable. The issue in that case, being whether the employer was adequately equipped to assess the soundness of a particular investment, is far different from the issue presented here. Plaintiffs do not allege that Caliber failed to train its employees or that the transfer of assets was botched by an incompetent employee.

Caliber's decision regarding the level of staffing required to accomplish the trust-to-trust transfer was a business decision which had only an incidental effect on the plans. While Caliber certainly exercised some degree of discretion in determining its staffing needs for completing the transfer, "it is not the exercise of discretion alone that makes an employer's action subject to fiduciary standards." *Sengpiel*, 156 F.3d at 666. Rather, the exercise of discretion must relate to plan management or administration. In *Sengpiel*, we held that the employer did not act in a fiduciary capacity in dividing its retirement plans into four separate plans and using an arbitrary method of assigning some of its employees to those plans in connection with a spin-off of a corporate division. *See id.* We found that the division of the plan and assignment of employees did not concern plan administration or management. We believe that the circumstances in this case are analogous, in that the transfer of plan assets itself did not amount to management or administration of an ERISA plan. We emphasize that our conclusion in this case should not be construed as an unqualified rule that decisions regarding the number of employees needed to perform ERISA plan functions are never subject to ERISA's fiduciary obligations. However, under the facts of this case, the level of staff devoted to the transfer of assets was a business decision.

Even if we found that Caliber's staffing decision was subject to fiduciary obligations, we would affirm the district

(6th Cir. 1998). "However, the fact that an action taken by an employer to implement a business decision may ultimately affect the security of employees' welfare benefits does not automatically render the action subject to ERISA's fiduciary duties." *Id.* at 666; *see also Akers*, 71 F.3d at 231 ("ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants")(internal quotations and citation omitted). Instead, "only discretionary acts of plan management or administration, or those acts designed to carry out the very purposes of the plan, are subject to ERISA's fiduciary duties." *Akers* at 231.

## 1.

Plaintiffs contend that Caliber breached its fiduciary duties in several ways. Plaintiffs concede, as they must in light of our decision in *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995), that Caliber's decision to transfer assets to the 401(k) Plan was a business decision not subject to ERISA's fiduciary requirements. However, Plaintiffs argue that Caliber breached its fiduciary duties in several ways in the course of implementing its business decision.

Plaintiffs first contend that Caliber's failure to provide adequate staff to transfer SBP and SSRIP assets in a timely manner constituted a breach of fiduciary duty. As support, Plaintiffs cite *Frahm v. Equitable Life Assurance Society of United States*, 137 F.3d 955 (7th Cir. 1998), *Schmidt v. Sheet Metal Workers' National Pension Fund*, 128 F. 3d 541 (7th Cir. 1997), and *Martin v. Harline*, No. 87-NC-115J, 1992 U.S. Dist. LEXIS 8778 (D. Utah Mar. 30, 1992). Those cases are inapposite here because they involved situations in which employees administering ERISA plans were either incompetent or not properly trained to perform the duties required. For example, in *Schmidt*, the court observed that plan trustees may breach their fiduciary duties by failing to properly train an employee or by retaining the employee in

spin-off arguably falls within the latter category, meaning that a termination of employment occurred. That conclusion also means that distribution rights are barred by § 8.10 under the circumstances of this case as discussed above.

Whether or not a termination of employment occurred under the SSRIP has no bearing on whether a termination of employment occurred under the SBP, however, because the SBP defines the phrase differently. Section 7.2(a) of the SBP states that "a Participant shall be eligible to receive a distribution of the vested portion of his Account upon his termination of employment with the Controlled Group due to . . . termination initiated by the Employer (as defined in Section 4.7(d)) . . . ." (SBP § 7.2(a), J.A. 272.) The pertinent language of § 4.7(d) states that "a 'termination initiated by an Employer' means a termination of a Participant's employment with all Controlled Group Members at the request or demand of one or more Controlled Group Members . . . ." (SBP § 4.7(d), J.A. 253.) Plaintiffs interpret § 4.7(d) as applying when REX ceased to be a controlled group member because that is also when their "employment with all Controlled Group Members" ended. However, such an interpretation misconstrues the import of this provision. We agree with the district court's assessment that this provision really focuses on whether the employee's employment relationship has ended rather than upon the employer's status as a controlled group member. Specifically, the termination itself must come "at the request or demand of one or more of the Controlled Group Members." Plaintiffs presented no evidence that any controlled group member requested that their employment be terminated. Plaintiffs' contention that they were terminated at the request of Caliber, REX, or both, misconstrues the plain meaning of § 4.7(d), because the spin-off plan did not involve a request or demand by anyone to terminate Plaintiffs' employment. Moreover, nothing in § 4.7(d) even remotely suggests that a situation where employees remain employed by the same employer in their same positions results in a termination of employment after a tax-free spin-off, especially where their employer continues the plan. None of ERISA's

purposes would be served by allowing such an interpretation. Therefore, Caliber's interpretation that no termination of employment occurred was not arbitrary and capricious.

We now return to Plaintiffs' initial argument – that they became entitled to a distribution under SBP § 14.4, SSRIP § 15.4 when REX's participation in the SBP and SSRIP terminated. While Plaintiffs' interpretation is creative, we find it unconvincing because those sections require that the plan terminate as to an employer, not that an employer cease to be an "Employer" under the plan. Ceasing to be an "Employer" is a consequence of the plan terminating as to an employer; the reverse is not necessarily true. As discussed above, because the assets were transferred to the 401(k) Plan, REX continued to maintain the plans as if it were the original plan sponsor. Therefore, Caliber's interpretation that the SBP and SSRIP did not terminate as to REX was reasonable.[5]

In considering whether a termination occurred giving rise to distribution rights, the district court examined whether Caliber could have distributed Plaintiffs' accounts to them without running afoul of the tax laws governing the plans' tax-free status. After reviewing the provisions of the tax code governing situations in which lump sum distributions may be made without jeopardizing the qualified status of the plan, the district court concluded that a lump sum distribution in this case could have resulted in the loss of qualified status for the SBP and the SSRIP under the IRS's "same desk rule," which provides that an employee does not incur a separation of employment where the employee remains in the same job

---

[5] Another reason to conclude that SBP § 14.4 and SSRIP § 15.4 did not give Plaintiffs the right to a distribution is that both sections refer to the articles governing distributions (SBP Article VII; SSRIP Article VIII). Under each of those provisions, a termination of employment is the only possible event giving rise to a lump sum distribution right in this case. Because Caliber's interpretation that a termination of employment did not occur was not arbitrary and capricious, no distribution rights arose under SBP § 14.4 or SSRIP § 15.4.

    (ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

29 U.S.C. § 1104(a)(1). This section imposes "'an unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and, in so doing, to act as a prudent person would act in a similar situation.'" *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 946 (6th Cir. 1990)(quoting *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir. 1984)).

We have recognized that employers who are also plan sponsors wear two hats: one as a fiduciary in administering or managing the plan for the benefit of participants and the other as employer in performing settlor functions such as establishing, funding, amending, and terminating the trust. *See Akers v. Palmer*, 71 F.3d 226, 231 (6th Cir. 1995); *Drennan v. General Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992); *Musto v. American Gen. Corp.*, 861 F.2d 897, 911 (6th Cir. 1988). The fiduciary obligations imposed by ERISA are implicated only where an employer acts in its fiduciary capacity. *See Akers*, 71 F.3d at 231. Thus, we must examine the conduct at issue to determine whether it constitutes "management" or "administration" of the plan, giving rise to fiduciary concerns, or "merely [a] 'business decision[]' that ha[s] an effect on an ERISA plan" not subject to fiduciary standards. *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665

Finally, we affirm the grant of summary judgment on the § 204(g) claim on the alternative ground cited by the district court in its opinion. That ground focuses on the timing of the distribution. Under SBP § 7.2(a), a participant is entitled to a distribution based upon termination of employment "in no event before the April of the year following the year in which the Participant terminates employment with the Controlled Group." (SBP § 7.2(a), J.A. 273.) A distribution may be made under the SSRIP in the case of a termination of employment "in no event before the end of the second month following the month of the Participant's Termination of Employment." (SSRIP § 8.2(b), J.A. 421.) A termination of employment occurs under the SSRIP, for purposes of this case, "twelve (12) months after [the participant's] last day worked with the Controlled Group." (SSRIP § 2.45, J.A. 385.)

Under Plaintiffs' theory, a termination of employment occurred, if at all, on January 1, 1996, when REX ceased to be an employer under the SBP and the SSRIP. Applying SBP § 7.2(a) and SSRIP §§ 8.2(b) and 2.45, Plaintiffs would have been entitled to a distribution no earlier than April or March 1997, respectively, well after the time they actually received their accounts. Therefore, Plaintiffs' claim fails on that basis alone.

**B.**

Plaintiffs also alleged that Caliber and REX breached their fiduciary duties in several respects. The duties of an ERISA fiduciary are set forth in ERISA § 1104(a)(1), which provides that

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and

following a transfer of assets to a new employer. *See Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1146 (3d Cir. 1993)(citing Rev. Rul. 79-336, Rev. Rul. 80-129, Priv. Ltr. Rul. 86-14-048 (Jan. 9, 1986)); *In re Fairchild Indus. , Inc. & GMF Inv., Inc. "ERISA" Litig.*, 835 F. Supp. 603, 610 (N.D. Fla. 1993)(mem. op.)(noting that "[t]he [IRS] takes the position . . . that a distribution to an employee which occurs during a corporate reorganization or liquidation in which the employee remains in the same job, but employed by a different entity, does not qualify as a distribution on account of a separation of service")(citing Rev. Rul. 79-336, Rev. Rul. 80-129). In addition, the district court relied on IRS General Counsel Memorandum 39824, which concludes that no severance of employment occurs under circumstances where, as here, the assets and liabilities of a plan are transferred to a plan created or maintained by the transferee-employer. *See* Gen. Couns. Mem. 39824 (July 6, 1990), 1990 WL 698027 (I.R.S.).

Plaintiffs do not argue that the district court erred in concluding that a distribution would have jeopardized the qualified status of both the SBP and the SSRIP. Instead, Plaintiffs assert that the district court ignored our decision in *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368 (6th Cir. 1994). In that case, we rejected the district court's reliance upon cases involving the proper tax treatment of lump sum payments to employees in determining whether the *Wulf* plaintiffs were terminated from their employment. We reasoned that the tax cases were not "controlling, or even particularly helpful," because they dealt with "an uncontested right to receive distributions," whereas the issue in *Wulf* was at what point the plaintiffs were entitled to distributions. *Wulf*, 26 F.3d at 1375. Notwithstanding our statements in *Wulf*, nothing in that case stands for the broad proposition urged by Plaintiffs that tax cases and rulings may not be used as aid for interpreting ERISA plans, especially where such materials may shed light on how the IRS would interpret the effect of a particular event on an ERISA plan's qualified status.

We also reject Plaintiffs' argument that *Wulf* controls in this case.  In that case, Quantum Chemical sold its Emery Division, in which the plaintiffs were employed, to Henkel Corporation on April 17, 1989.  Henkel initially agreed to offer employment to all former employees of the Emery Division and to accept a transfer of plan assets and liabilities from all of Quantum Chemical's plans into either an existing plan or a new plan formed for that purpose.  However, after the sale, Henkel refused to complete the trust-to-trust transfer.  Therefore, Quantum amended its plan on December 14, 1989, retroactively effective to April 15, 1989, to provide for distribution of plan assets to participants in the event that Quantum sold all of its assets or one of its subsidiaries and the participants continued employment with the purchaser.  The participants who elected to receive their individual account balances received them in December 1989.  The plaintiffs brought suit under ERISA, alleging that the vested portions of their accounts should have been valued and distributed in April 1989 rather than in December 1989.  The plaintiffs alleged that under a provision of the plan in effect at the time of the sale providing for a distribution upon termination of employment, they were entitled to a distribution in April 1989.  The defendants denied that the plaintiffs and other employees of the Emery Division experienced a termination of employment upon the sale of the Emery Division.  We concluded that the plan language regarding whether a termination of employment occurred was ambiguous and looked to extrinsic evidence to determine the intent of the parties.  The evidence consisted of a letter to all employees and a newsletter, which stated that accounts would be distributed to participants when they left Quantum.  We held that based upon that evidence, which affected the plaintiffs' understanding of their rights, the plaintiffs' employment had been terminated.

*Wulf* is distinguishable from this case for several obvious reasons.  First, in *Wulf* the plaintiffs actually experienced a termination of their employment in the sense that their relationship with Quantum severed or terminated and they

became employees of a new company.  In this case, REX did not purchase a subsidiary or assets from Caliber, and Plaintiffs always remained employees of REX.   This distinction is key, as the plaintiffs in *Wulf* believed that they had been terminated, whereas in this case Plaintiffs concede that there was no termination.

Second, in *Wulf* there was no trust-to-trust transfer that allowed Henkel to accept the plan assets and liabilities and step into the shoes of Quantum to continue to maintain the plan.  Had the assets and liabilities been transferred as originally contemplated by the parties, the termination issue would likely have never come up.  Because a trust-to-trust transfer occurred in this case, REX continued to maintain the Caliber Plans with respect to REX employees.  Therefore, none of ERISA's purposes would be served by a distribution of participant accounts.

Finally, we applied the more demanding *de novo* standard of review in *Wulf* rather than the highly deferential arbitrary and capricious standard that we have found appropriate in this case.  The *Wulf* plaintiffs submitted evidence which clearly supported a conclusion that a termination of employment had occurred, giving rise to distribution rights.  Here there is no such evidence, and Caliber has offered a reasoned explanation for its interpretation.

For many of the same reasons, we reject Plaintiffs' reliance on *Davis v. Burlington Industries, Inc.*, 796 F. Supp. 866 (E.D.N.C. 1991), *aff'd*, 966 F.2d 890 (4th Cir. 1992).  In our judgment, however, the most prominent reason for distinguishing *Davis* is that the participants' employment actually terminated when the Burlington Industries subsidiary by which they were employed was sold.  Furthermore, the plan in that case provided an exception to the payment of benefits if the new owner continued the plan, which, unlike this case, did not happen. *See Davis*, 796 F. Supp. at 868-70.