COOK, Circuit Judge,
dissenting.
With “the critical question for us [being] whether it was arbitrary and capricious ... for Connecticut General [“CG”] to conclude from the evidence before it that Kristen Johnson knowingly failed to disclose a prior diagnosis or treatment for ‘high blood pressure’ in the application for additional coverage,” (Majority Op. at 468), I would hold that CG’s administrative action withstands our least demanding scrutiny — arbitrary-and-capricious review. See Hunter v. Caliber Sys., Inc., 220 F.3d 702, 710 (6th Cir.2000).
Despite setting up the issue as concerning Johnson’s failure to disclose any prior diagnosis or treatment for high blood pressure, the majority reaches its decision to label CG’s rescission arbitrary and capricious by scrutinizing the administrative record for the timing of a definitive diagnosis of hypertension. Focusing on hypertension varies the question and skews the answer. If hypertension were the condition that the enrollment application and questionnaire probed, I could agree with the majority that CG’s medical underwriting review should have discounted any post-application diagnoses as irrelevant. But because the administrative record provides ample bases for the conclusion that Johnson knowingly failed to disclose “a prior diagnosis or treatment for ‘high blood pressure,’ ” CG’s decision cannot be judged arbitrary and capricious.
First, Johnson’s answers during the supplemental enrollment process contradict what the administrative record shows she told her own doctors. She admitted to Dr. Nashawati on July 2, 2002 — over a year prior to completing the forms at issue here — that she had “a lot of problems with blood pressure” during pregnancy, including labile blood pressure. Labile blood pressure includes erratic fluctuations between low and high pressure, and includes a hypertensive element. (Ruch Dep. at 101-02). Yet, she did not disclose any blood pressure problems on her application. And on a follow-up questionnaire, she answered “no” to a question that asked: “Have you ever had or been told you had high blood pressure, heart or lung disease?” This record evidence alone should foreclose finding that CG arbitrarily and capriciously concluded that Johnson knowingly failed to disclose prior high blood pressure. But CG relied on other evidence too.
The administrative record confirms that during her first pregnancy — just nineteen months before applying for the supplemental insurance — Johnson suffered bouts of preeclampsia, a pregnancy-related disorder “characterized by high blood pressure and the presence of protein in the urine.” See Preeclampsia Foundation, http://www. preeclampsia.org/about.asp (emphasis added). Following her postpartum visit, Dr. Patricia Rubin wrote:
She states that during the last trimester of her pregnancy, she began to get hypertensive .... Here in the hospital she had been on Aldomet and had also been on magnesium sulfate drip for hypertension. She states in the last trimester of *471 her pregnancy she had also been having some problems with headache which may be attributable to her hypertension. She states that prior to her pregnancy, she did not have any problems with high blood pressure.
And Johnson later reported this prior preeclampsia, as well as “erratic blood pressure and feeling dizzy with near syncope [fainting] after the first pregnancy” to Dr. Morisetty. Like her labile blood pressure, her problems with preeclampsia alone — undisclosed in the application process — support CG’s conclusion that she knowingly failed to disclose “prior diagnosis or treatment for high blood pressure.”
Johnson’s labile blood pressure and preeclampsia history also explain Dr. Pa-repally’s report of “hypertension” and the reasonableness of CG’s reliance on it. The district court and majority alike criticize this report, the district court noting that “[n]othing shows what supports Parepally’s history.” But taken in context, Dr. Parepally’s conclusion looked to Johnson’s history of labile blood pressure and preec-lampsia — both conditions with hypertensive components, even though they are not by definition “hypertension.” And the fact that Dr. Parepally’s report recited that Johnson told him that she had been hospitalized for blood pressure in 2002 — the year before she applied for supplemental coverage — supplied CG with insight as to what Johnson knew about her own medical history. It was not unreasonable then for CG to extrapolate from Parepally’s report that Johnson knew of her high-blood-pressure treatment and diagnosis when she completed the application for additional coverage.
In disregarding the pertinent question posed by the enrollment form and the application, prior diagnosis or treatment for high blood pressure, in favor of a focus on hypertension, the majority offers the following explanation for rejecting CG’s reasons for denying coverage:
Neither [Dr. Parepally’s] report, nor Dr. Morisetty’s report two years later, states that she had or was treated for hypertension in 2002. Rather, these reports reflect that Kristen Johnson experienced ‘problems with blood pressure,’ experienced ‘erratic’ or ‘labile’ blood pressure, and had symptoms of near syncope or fainting.
(Majority Op. at 469). In the same vein, the majority highlights the pre-2002 records indicating “labile” blood pressure, not hypertension — offering the rationale that “having labile blood pressure is not the same as having hypertension.” (Majority Op. at 469). But the majority set out to ask “whether it was arbitrary and capricious ... for Connecticut General to conclude ... that Johnson knowingly failed to disclose ... ‘high blood pressure’,” not hypertension. The district court made the same mistake, examining the record for signs of hypertension when it should have focused on diagnosis or treatment for high blood pressure.
’ CG’s application process sought truthful answers regarding Johnson’s medical history, including any history of “high blood pressure,” the common term typically understood by lay persons. It probed a broader range of medical conditions than just hypertension — presumably to evaluate a broader range of underwriting risks, such as a history of elevated blood pressure problems. See MacKenzie v. Prudential Ins. Co. of Am., 411 F.2d 781, 782 (6th Cir.1969) (explaining that underwriters rely on truthful application answers to properly evaluate whether to issue coverage). When Kristen Johnson died at age 37, within two years of applying for $174,000 of additional life insurance, from a condition that, if disclosed in conjunction with her hypothyroidism, would have dis *472 qualified her under CG’s underwriting guidelines, CG appropriately reviewed whether Johnson knew about medical history related to high blood pressure. Maybe CG would have approved the additional coverage even if she disclosed prior high blood pressure. But the disclosure, to which CG was contractually entitled, would have given CG a fair opportunity to evaluate whether the labile blood pressure, preeclampsia, or both, when experienced by an applicant disclosing thyroid problems, warranted either further inquiry or rejection due to the additional risk.
Faced with this administrative record evidencing Johnson’s knowing failure to disclose “prior diagnosis or treatment for high blood pressure,” I cannot agree to the majority’s labeling CG’s decision as arbitrary and capricious and thus respectfully dissent. I would reverse the district court judgment.