RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0371p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

ANTHONY DELUCA,

> *Plaintiff-Appellant,*

*v.*

No. 08-1085

BLUE CROSS BLUE SHIELD OF MICHIGAN,

> *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-12552—Patrick J. Duggan, District Judge.

Argued: March 9, 2009

Decided and Filed: December 8, 2010

Before: DAUGHTREY, ROGERS, and KETHLEDGE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Stephen Wasinger, STEPHEN F. WASINGER PLC, Royal Oak, Michigan, for Appellant. Evan Miller, JONES DAY, Washington, D.C., for Appellee. **ON BRIEF:** Stephen Wasinger, STEPHEN F. WASINGER PLC, Royal Oak, Michigan, for Appellant. Evan Miller, JONES DAY, Washington, D.C., E. Michael Rossman, JONES DAY, Columbus, Ohio, Robert Hurlbert, DICKINSON WRIGHT, PLLC, Bloomfield Hills, Michigan, K. Scott Hamilton, DICKINSON WRIGHT, PLLC, Detroit, Michigan, Leo A. Nouhan, BLUE CROSS AND BLUE SHIELD OF MICHIGAN, Detroit, Michigan, for Appellee.

DAUGHTREY, J., delivered the opinion of the court, in which ROGERS, J., joined. KETHLEDGE, J. (pp. 8–14), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

MARTHA CRAIG DAUGHTREY, Circuit Judge. The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, provides, in pertinent

1

part, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . ." 29 U.S.C. § 1104(a)(1). In this putative class action appeal, plaintiff Anthony DeLuca and defendant Blue Cross Blue Shield of Michigan (BCBSM) agree that, at least for certain purposes, BCBSM served in a fiduciary capacity for a welfare benefit plan self-funded by Flagstar Bank for its employees and their families. DeLuca contends that BCBSM's fiduciary status should have prevented it from engaging in contract negotiations with various hospitals that would ultimately raise the costs that Flagstar Plan participants were required to pay for hospitalization. The district court disagreed with the plaintiff's assessment of BCBSM's dealings, holding that BCBSM was not acting as a fiduciary when negotiating system-wide payment schedules for the various levels of its health insurance coverage, and granted summary judgment for the defendant.

On appeal, DeLuca insists that the district court erred both in failing to hold that BCBSM functioned as a fiduciary under 29 U.S.C. § 1002(21)(A) and in failing to interpret the "broad language" of 29 U.S.C. § 1106(b) to impose fiduciary status on BCBSM in virtually all its business dealings. DeLuca also faults the district court for making erroneous factual findings in BCBSM's favor to support the court's grant of summary judgment. We conclude that the district court determined correctly that BCBSM was not acting in a fiduciary capacity in negotiating hospital reimbursement rates and that there was no genuine dispute of material fact that would prevent entry of summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

BCBSM is a non-profit health care corporation that provides a number of health care services to employers and individuals. It offers three forms of health-care coverage: a traditional open-access plan, a preferred provider (PPO) plan, and a health maintenance organization (HMO) that BCBSM operates through a subsidiary, Blue Care Network. In many cases, BCBSM offers insured health-care coverage, for which an employer or individual pays a fixed premium and BCBSM bears the risk that actual expenses will exceed that premium. BCBSM also administers self-insured plans, providing services for a fee, and the plan then reimburses BCBSM for actual medical expenses. In that

case, the plan bears the risk that medical expenses will exceed expectations. For each of its coverage options, BCBSM negotiates rates with Michigan health-care providers such as doctors and hospitals. There are separate rates for each of its three coverage options – the traditional plan, the PPO plan, and the HMO – but rates are standard within each category. BCBSM's status as a large purchaser of health-care services allows it to negotiate favorable rates, and those favorable rates enable BCBSM to offer competitive pricing for their insured plans and to attract customers for their self-insured plans.

Flagstar Bank has long maintained a self-insured health benefit plan for its employees. In January 1996, Flagstar Bank entered into a contract with BCBSM, under which BCBSM agreed to provide claims-processing and other administrative services for the Flagstar Plan in return for a fee. The agreement stated:

> BCBSM shall administer Enrollees' health care Coverage(s) in accordance with BCBSM's standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to [Flagstar Bank], and this Contract. . . . The responsibilities of BCBSM pursuant to this Contract are limited to providing administrative services for the processing and payment of claims.

The contract also specified that "BCBSM will process and pay, and [Flagstar Bank] will reimburse BCBSM for[,] all Amounts Billed related to Enrollees' claims incurred during the Term(s) of this Contract." Flagstar Bank and BCBSM renewed the contract each year preceding the filing date of the present action. In 2003, BCBSM and Flagstar Bank entered into a "business associate addendum" to the administrative services contract, one goal of which was "to comply with applicable requirements of . . . the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations." The addendum provided that BCBSM was responsible for "[e]stablishing, arranging, and maintaining provider networks, including managed care point-of-service, preferred provider, and traditional networks through contractual arrangements with preferred participating hospitals, physicians, and other health care providers and with other Health Plans within designated service areas."

Prior to 2004, the rates paid by BCBSM's traditional and PPO plans were lower than the HMO rates for many health-care providers. Beginning around 2004, in an effort to increase the HMO's competitiveness and to simplify pricing structures, BCBSM negotiated a series of letters of understanding with various hospitals that altered these preexisting rate agreements. Typically, these agreements were structured to equalize the rates paid by the HMO with those paid by the PPO plan. BCBSM agreed to make the rate adjustments budget-neutral for the health-care providers by increasing the PPO and traditional plan rates to make up for the decrease in the HMO rates. Some of these rate adjustments were retroactive to the beginning of the year in which they were negotiated.

DeLuca, a practicing attorney in Grosse Point Park, Michigan, was a beneficiary of the Flagstar Bank Group Health Plan through his wife's participation as a Flagstar Bank employee. In 2006, he filed the present action against BCBSM alleging that BCBSM violated its duties as a fiduciary under two provisions of ERISA, 29 U.S.C. § 1104 and § 1106(b), by agreeing to increase its traditional and PPO plan rates in exchange for decreases in the HMO rates. After the completion of discovery, the district court granted BCBSM's motion for summary judgment, concluding that BCBSM was not acting as a fiduciary for the Flagstar Plan when it negotiated the rate adjustments. DeLuca now appeals, arguing that BCBSM was indeed acting as an ERISA fiduciary under 29 U.S.C. § 1104 when it negotiated the rate changes and, alternatively, that *acting* in a fiduciary capacity is not a required element of a liability claim under the "other capacity" provision in 29 U.S.C. § 1106(b)(2), as long as BCBSM simply had the *status* of a fiduciary.

## *DISCUSSION*

As the Supreme Court has noted in *Pegram v. Herdrich*, 530 U.S. 211 (2000):

> In general terms, fiduciary responsibility under ERISA is simply stated. The statute provides that fiduciaries shall discharge their duties with respect to a plan "solely in the interest of the participants and beneficiaries," § 1104(a)(1), that is, "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," § 1104(a)(1)(A).

*Id.* at 223-24. The district court ruled that BCBSM did not violate 29 U.S.C. § 1104 because it was not acting as a fiduciary when negotiating the rate changes at issue in this case. We agree. Although ERISA has strict fiduciary-duty provisions, those standards apply only when an individual or entity is acting as a fiduciary, defined by 29 U.S.C. § 1002(21)(A) as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

BCBSM acted in two capacities during the course of its business relationship with the Flagstar Plan. First, BCBSM acted as the administrator and claims-processing agent for the plan. The parties do not dispute that BCBSM acted as a fiduciary in this capacity by, for instance, making discretionary eligibility determinations. But a party is subject to fiduciary liability under ERISA only when the party "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226. For purposes of this case, therefore, BCBSM's liability under 29 U.S.C. § 1104 thus depends on whether BCBSM was a fiduciary in its second capacity: as a distributor of health-care services, negotiating discounted rates for such services and passing the savings along to Flagstar Bank.

We conclude, as did the district court, that BCBSM was not acting as a fiduciary when it negotiated the challenged rate changes, principally because those business dealings were not directly associated with the benefits plan at issue here but were generally applicable to a broad range of health-care consumers. The Supreme Court has recognized that ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over [a] plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *see also Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999) ("the definition of a fiduciary under ERISA is a functional one, is intended to be broader than the common law definition, and does not turn on formal designations such as who is the trustee"). As a result, in determining liability for an alleged breach of

fiduciary duty in an ERISA case, the courts "must examine the conduct at issue to determine whether it constitutes 'management' or 'administration' of *the plan*, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary standards." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000) (emphasis added) (internal quotation marks and alterations omitted) (citing *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998)). In this case, the "conduct at issue" clearly falls into the latter category, "a business decision that has an effect on an ERISA plan not subject to fiduciary standards."

Furthermore, a contrary analysis – one saddling BCBSM with the fiduciary obligation to negotiate Flagstar-Plan-specific rates – would be self-defeating. The financial advantage underlying BCBSM's rate negotiations arises from the market power that BCBSM has as a large purchaser of health-care services. BCBSM is continuously in the process of re-negotiating prices for its three health-care coverage options and, thus, must continuously determine how much of that market power to allocate to achieving discounted prices for each of these options. If, however, BCBSM would be required to negotiate solely on a plan-by-plan basis, as a practical matter its economic advantage in the market would be destroyed, damaging its ability to do business on a system-wide basis, ultimately to the Flagstar Plan beneficiaries' disadvantage.

DeLuca suggests two additional bases on which we might determine that BCBSM acted as a fiduciary when negotiating the rate changes, neither of which we find persuasive. First, DeLuca suggests that it is not proper in this case to consider BCBSM's claims-processing and rate-negotiating roles separately. But we are required to do so under *Pegram*. *See* 530 U.S. at 226. Second, DeLuca argues that BCBSM was acting as a fiduciary when it negotiated the rate changes because it "exercise[d] any authority or control respecting management or disposition of [plan] assets." 29 U.S.C. § 1002(21)(A). Even if BCBSM did have authority or control respecting plan assets, this argument is also refuted by *Pegram*. As previously noted, that opinion holds that liability for a breach of fiduciary duty can occur only when a party "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226. DeLuca's argument is not that BCBSM

unwisely invested, wrongly appropriated, or otherwise squandered plan assets under its authority or control.  Instead, the action subject to complaint in this case is BCBSM's negotiation of rates.  Regardless of whether BCBSM exercised discretionary authority or control over plan assets in some other contexts, the challenged rate negotiations were not an exercise of such authority or control.  BCBSM thus did not act as a fiduciary when negotiating the rate changes.

BCBSM also did not engage in prohibited transactions in violation of 29 U.S.C. § 1106(b)(2).  That section provides, "A fiduciary with respect to a plan shall not . . . in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."  DeLuca's argument, as we understand it, is that the terminology "in any other capacity" imposes liability on a fiduciary even when *not* acting in a fiduciary capacity, at least with regard to those activities prohibited by section 1106.  Such an interpretation, however, flies in the face of our holding that, "by its own terms, § 1106 applies only to those who act in a fiduciary capacity."  *Hunter*, 220 F.3d at 724.  Because BCBSM was not acting in a fiduciary capacity when it negotiated the rate changes at issue in this case, BCBSM did not violate § 1106(b)(2).

DeLuca also contends that in ruling favorably on BCBSM's motion for summary judgment, the district court erroneously found facts adverse to DeLuca.  Because we do not rely on any of the allegedly erroneous facts in reviewing the district court's legal conclusions, we need not address DeLuca's arguments on this point.  In addition, we note that most of the allegedly disputed facts were based on conclusory statements by DeLuca, rather than on evidence in the record.

## *CONCLUSION*

For the reasons set out above, we AFFIRM the judgment of the district court.

———————————

**DISSENT**

———————————

KETHLEDGE, Circuit Judge, dissenting. The facts of this case are regrettable. Flagstar Bank contracted with Blue Cross Blue Shield of Michigan ("Blue Cross") to administer Flagstar's self-insured health-benefits plan. Among the "[s]ervices"—the Contract between Flagstar and Blue Cross describes them as such—that Blue Cross agreed to provide were "[e]stablishing, arranging, and maintaining provider networks . . . through contractual arrangements with preferred participating hospitals, physicians, and other health care providers[.]" One of the years in which Blue Cross agreed to provide these "[s]ervices" was 2004. In the latter half of that year, however, Blue Cross apparently concluded that its own wholly owned subsidiary, the Blue Care Network ("BCN") HMO, was not sufficiently profitable.

So, in approximately September of that year, Blue Cross circled back to many of its participating hospitals and renegotiated the rates that those hospitals would charge not only BCN, but also self-insured plans like the Flagstar Plan. Indeed that was the idea: The decrease in BCN's rates would be "budget neutral" for each hospital, Blue Cross explained, because Blue Cross would agree to a commensurate *increase* in the rates paid by the self-insured plans that Blue Cross represented. Many hospitals agreed to the deal. The rate increases were also made retroactive to January 1 of that year—about nine months before the deals were signed—which means the Flagstar Plan (and others) was billed anew for services it had already paid for. Thus, in a nutshell, Blue Cross lowered rates for its own subsidiary by effectively raising them for Flagstar and other self-insured plans. The letter agreements between Blue Cross and the hospitals spell out these facts in black and white.

But that does not mean that Flagstar knew about the deals. To the contrary, Blue Cross has admitted (in interrogatory responses in this case) that it never told Flagstar it had raised the Plan's rates in order to lower them for its own subsidiary. And it appears that Flagstar was otherwise clueless about the change, because Blue Cross did not provide backup data for the bottom-line charges it sent Flagstar each month.

No one disputes that these facts would amount to a breach of fiduciary duty, in the ERISA sense of the term, if Blue Cross's duties to Flagstar with respect to "[e]stablishing, arranging, and maintaining provider networks" were indeed fiduciary. Whether they were, therefore, is the principal question presented here. The statute provides:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assests . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). We "employ[] a functional test to determine fiduciary status[,]" rather than focus on titles (e.g., "trustee") or on limiting language in the parties' agreement. *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006).

Whether Blue Cross functioned as a fiduciary when it established and maintained provider networks for Flagstar depends on how one characterizes their agreement. DeLuca says—and I think no one disagrees—that the function of negotiating rates with provider hospitals surely would have been fiduciary in nature had the Plan's trustees kept that function in-house; and in DeLuca's view, the Contract merely delegated that function from the trustees to Blue Cross. He therefore contends that Blue Cross was acting as a fiduciary when, as part of the services it provided under the Contract, it negotiated rates for the Plan. In contrast, Blue Cross argues that it actually provided a *product*—off-the-shelf access to its provider network at whatever rates Blue Cross cared to negotiate with them—rather than services.

The difference matters because, while selling a product tends not to create fiduciary duties under ERISA, providing services quite frequently does. And that is especially true for discretionary services that directly impact a plan's finances. The nub of this case, therefore, is which conception of the parties' agreement is right.

I do not think this issue is one we can fairly decide—at least in Blue Cross's favor—as a matter of law. Each side has legitimate points to make about it. On the one

hand, there is the Contract's own description of Blue Cross's obligation: "*[e]stablishing, arranging, and maintaining* provider networks[.]" (Emphasis added.) Those words describe conduct rather than a commodity. And the Contract itself characterizes these things as "Services" that "BCBSM [was] To Provide[.]" I do not think that characterization is one that Blue Cross can brush off as a matter of law, particularly given that the Contract itself recites that it "represents the entire understanding and agreement of the parties[.]" In construing a contract, the words matter; and the words here point clearly in the direction of services.

But, on the other hand, there is the reality that Blue Cross negotiates rates for its self-insured customers in gross, rather than individually for each of them. That does tend to make what Blue Cross provided here look less like negotiations and more like off-the-shelf access to providers and rates. The majority seems to regard this fact as dispositive. In doing so, however, I think the majority makes an assumption that we should not make for purposes of summary judgment.

The assumption is that if, in fact, Blue Cross agreed to negotiate on Flagstar's behalf, it could only have conducted those negotiations on behalf of Flagstar alone. (Blue Cross obviously did not negotiate for Flagstar alone, so the majority concludes that it did not agree to negotiate for Flagstar at all.) I see no basis for that assumption. The Contract nowhere prohibits Blue Cross from negotiating on behalf of all of its client plans at once. So far as the Contract is concerned, Blue Cross's obligation was simply to establish, arrange, and maintain provider networks; and if Blue Cross discharged that obligation at the same time it discharged the same obligation to other plans, the terms of the Contract afforded Flagstar no reason to complain. So the possibility remains that Blue Cross agreed to provide what the Contract says it agreed to provide: services. And I otherwise see no basis in the record to decide, as a matter of law, that Flagstar agreed to buy a product rather than services.

Not surprisingly, then, Blue Cross's principal arguments on appeal concern not the record, but policy. Blue Cross says we would disrupt its "business model"—and thus, we are told, the health-insurance market in Michigan—if we deemed it an ERISA fiduciary when it negotiates rates for ERISA health-benefit plans. The argument

assumes that ERISA itself might forbid Blue Cross from negotiating on behalf of its client plans in gross if, in doing so, Blue Cross acts as a fiduciary. But here again I see no basis for the assumption. If, as Blue Cross continually emphasizes in its brief, Blue Cross obtains *better* rates for its client plans by negotiating for them in gross, I do not think the statute's standard of care for fiduciaries (set forth in 29 U.S.C. § 1104) would require Blue Cross to negotiate on behalf of the plans individually, with *worse* results. The fiduciary's duty above all is one of loyalty; and I see no breach of that duty in banding together with other plans to obtain a better result for all. What the statute *would* require, of course, is that Blue Cross refrain from self-dealing—which is exactly what DeLuca says happened here.

Another part of Blue Cross's business model—as the letter deals themselves illustrate—is to negotiate rates for its wholly owned subsidiary, BCN, at the same time it negotiates rates for its client plans. Blue Cross suggests that this part of its model would go out the window if it were deemed a fiduciary when it negotiates rates for the plans. That marginal loss of leverage, Blue Cross suggests, would be a bad thing for the plans. I believe the facts of this case suggest the contrary. Sometimes loyalty is more important than leverage.

More fundamentally, I reject the unspoken premise of the preceding two arguments, which is that we should be acutely concerned about Blue Cross's business model in the first place. Cases have consequences, and we should be mindful of them. But our task in this case is not to divine the business model that best serves the plans' interests and those of everyone else; our task, instead, is the comparatively simple one of determining whether the letter deals violated ERISA. The wisdom of business models can be determined elsewhere.

Thus, to summarize: The record here would allow a jury to find that Blue Cross agreed to provide services rather than a product. Those services—"[e]stablishing, arranging, and maintaining provider networks . . . through contractual arrangements" with hospitals and other health-care providers—are highly discretionary and have a direct impact on the Plan's bottom line. Thus, if Blue Cross indeed provided those services, it was an ERISA fiduciary when it did so. And a jury could surely find that

Blue Cross breached its fiduciary duties when it made the letter deals.  Summary judgment should not have been granted as to DeLuca's claim under § 1104 of the statute.

\*      \*      \*

The majority also affirms the district court's grant of summary judgment as to DeLuca's claim under § 1106(b)(2).  They do so for the same reason that they affirm as to the § 1104 claim: Blue Cross, in their view, was not acting as a fiduciary when it negotiated rates for the Plan.  *See* Maj. Op. at 7.  But DeLuca says that reasoning should not apply to a § 1106(b)(2) claim.  As an initial matter, it is undisputed that Blue Cross is a fiduciary in its role as claims processor for the Plan.  And in DeLuca's view, § 1106(b)(2) (unlike § 1104) expressly allows a fiduciary to be held liable for certain actions taken in its *non*-fiduciary capacity.

Section 1106(b)(2) provides in relevant part: "A fiduciary with respect to a plan shall not . . . *in his individual or in any other capacity* act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan[.]"  (Emphasis added.)  DeLuca reads the italicized language to mean that Blue Cross can be liable for actions taken "in [its] individual or in any other capacity," so long as the challenged actions meet the other requirements of the subsection.

I have considerable sympathy for DeLuca's reading of this language.  The subsection says that fiduciaries shall not take certain actions even in their individual or other non-fiduciary capacities.  If a fiduciary then takes such an action—even in its individual capacity—a natural reading of the subsection is that it can be held liable for doing so.

But there is caselaw to the contrary.  In *Pegram v. Herdrich*, 530 U.S. 211 (2000), the Supreme Court stated that, "[i]n *every* case charging breach of ERISA fiduciary duty, then, the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) *when taking the action subject to complaint*."  *Id.* at 226 (emphasis added).  But *Pegram* was only a § 1104 case, so that statement is pure dicta as to § 1106(b)(2).  A similar statement by our court, however,

cannot be so characterized. In *Hunter v. Caliber System, Inc.*, 220 F.3d 702 (6th Cir. 2000), we said that, "by its own terms, § 1106 applies only to those who act in a fiduciary capacity." *Id.* at 724. The *Hunter* court characterized that statement as a holding (albeit an alternative one), and I cannot fairly recast it as dicta. It is binding precedent for our circuit.

That said, the statement strikes me as Orwellian as applied to § 1106(b)(2). In the plainest conceivable English, the section bars fiduciaries from taking certain actions even in their individual capacities; and yet, we are told, the section "applies only to those who act in a fiduciary capacity." *Hunter*, 220 F.3d at 724. Perhaps I am missing something. Perhaps the subsection requires not only that the fiduciary act in a non-fiduciary capacity on one side of a proscribed transaction, but that it also act in its fiduciary capacity on the other. (If so, to my knowledge no court has explained why that is so.) Or perhaps the statement just stands as a caution against overlong opinions with numerous alternative holdings.

That caution applies with special force to cases interpreting large and complex statutes like ERISA. Loose language in one case hardens into a holding in another, and other courts follow suit. Eventually the caselaw takes on a life of its own, often lived at variance with the rules laid down in the statute itself. We encountered precisely this scenario in *Central States, SE and SW Areas Pension Fund v. Int. Comfort Products, LLC*, 585 F.3d 281 (6th Cir. 2009), *cert. denied*, 131 S.Ct. 223 (2010), which was another ERISA case where the caselaw had diverted from the statute's terms. *See id.* at 287 ("The mere accumulation of contrary precedent in three other circuits does not, in our view, give us license to disregard the plain language of [29 U.S.C.] § 1392(a)"). And the problem is compounded here because the Supreme Court's dicta in *Pegram* is likely causing all the circuit courts to break one way. Perhaps eventually the Court will take a § 1106(b)(2) case and decide whether the subsection means what it seems clearly to say.

In the meantime, we have *Hunter*'s holding that § 1106(b)(2) imposes liability only for actions taken by a fiduciary *qua* fiduciary. For the reasons already explained, the majority and I disagree as to whether DeLuca can prove that Blue Cross acted as a

fiduciary when it negotiated the Plan's rates: they say as a matter of law that Blue Cross did not, I say a jury could find otherwise. Hence I think DeLuca can prove this element of his § 1106(b)(2) claim. I also think he can prove the claim's other elements. Notably, I think the letter agreements were transactions "involving the plan[.]" 29 U.S.C. § 1106(b)(2). In my view, transactions that have only some incidental effect upon a plan—raising the cost of paper clips, when the plan happens to buy them—do not "involve" the plan. But, at the same time, the statute's text does not require that the plan have been a *party* to the challenged transaction. What the statute requires, I think, is something in between: a transaction that in some fashion acts directly upon a plan, even if the plan is not a party to it. In my view, "budget-neutral" letter deals that achieve that status expressly by raising rates on this Plan and others meet that requirement. Thus I would reverse the district court's entry of summary judgment on this claim as well, and remand both claims for trial.

For these reasons, I respectfully dissent.